**CHANDRA L. PETERSON**
California State Bar No. 306935
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467
Facsimile: (619) 687-2666
Chandra_Peterson@fd.org

Attorneys for JOEL WRIGHT

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> JOEL WRIGHT, <br><br> Defendant. | CASE NO.: 16CR0354-DMS <br><br> REPLY TO THE GOVERNMENT'S RESPONSE IN OPPOSITION TO MR. WRIGHT'S MOTION TO REDUCE SENTENCE |

## I. INTRODUCTION

No matter how much the government wishes it to be, Mr. Wright is not defined by his conviction. Ours is not a system where justice is refused to those who have committed even the most heinous of offenses. Section 3553(a) does not choose which crimes merit certain considerations and which do not. Rather, all of the § 3553(a) factors must be weighed in each case, even serious ones such as Mr. Wright's. The government's response in opposition fails to engage in any meaningful analysis under § 3553(a) and focuses all of its attention on Mr. Wright's offense conduct – only one of the considerations this Court must weigh.

For all of the reasons discussed in his motion and this reply, Mr. Wright requests this Court grant his request for compassionate release.

## II. MR. WRIGHT'S REPLY TO THE GOVERNMENT'S RESPONSE

The government argues that this court should deny Mr. Wright's request for

compassionate release because he is dangerous and "the medical problems he cites now are essentially the same problems that did not prevent his crimes." Intertwined in these two points, the government revisits Mr. Wright's offense conduct in great detail while brushing aside Mr. Wright's detailed description of his medical conditions, the experiences he has had in prison for the past five years, the relationship between his health issues and COVID-19, the BOP's failure to provide him with counseling and sex offender treatment, Danbury's wholly inadequate response to COVID-19, the expert's opinion (from the original sentencing) about the unlikelihood of recidivism, his inability to care for himself in custody (which will not change once released), and his immense family support. All of these are considerations that this court must weigh when considering Mr. Wright's motions.

### A.     The government's dangerousness analysis is incomplete.

The government argues that because of the circumstances that led up to Mr. Wright's offense and because his medical problems are "essentially the same problems that did not prevent his crimes" he is dangerous and this Court should deny his motion.[1]

First and foremost, it is important the record be clear that Mr. Wright's medical conditions are not "essentially the same" as the medical conditions that "did not prevent his crimes." At the time of his offense and in the other circumstances prior to Mr. Wright's offense detailed in its response, Mr. Wright could still see, albeit he could not see well. Mr. Murphy, his prior counsel attests to his abilities at the time of his arrest versus his abilities at sentencing. *See* Exhibit AA, Declaration of Gregory Murphy, October 9, 2020. Mr. Murphy indicates that

---

[1] The government accuses Mr. Wright of "not acknowledging" the dangerousness requirement. *See* Gov. Br. at 2. The "dangerousness requirement" under U.S.S.G. § 1B1.13 only applies to sentencing reductions under 18 U.S.C. § 3582(c)(1)(A)(ii). Mr. Wright has filed a request for compassionate release under (c)(1)(A)(i). This is not to say that dangerousness is irrelevant. Rather, it is encompassed in the § 3553(a) factor "need to protect the public," and this is where Mr. Wright discussed it in his motion. Indeed, the government responds to Mr. Wright's argument that he is no longer a danger because of his deteriorated health.

when he first met Mr. Wright and at the beginning stages of his case, Mr. Wright could still see. *Id.* He would hold papers up close to his face so he could read them himself. *Id.* As a consequence of GEO's failure to treat Mr. Wright's glaucoma, Mr. Wright's eyesight deteriorated significantly and at sentencing he was essentially blind. *Id; see also* Exhibit BB 2016 Documentation of Health Issues. Unlike at the time of the offense, Mr. Wright is now completely blind.

The change in his abilities is detailed significantly in Mr. Wright's declaration to this court where he recounts what it is like for him to live a day in custody. Mr. Wright cannot survive in prison without the assistance of others. This was not the case prior to his arrest in this case. Now, from the very beginning of the day, he needs others to help him – he cannot eat without the assistance of others to collect his tray. Prior to COVID-19, Mr. Wright had a companion that was housed in another unit. His companion would be the one to meet him in his bunk area and escort him to the bathroom so he could use the restroom and brush his teeth. Mr. Wright uses a cane for the blind, but cannot get anywhere in the facility without the assistance of someone else. His companion is responsible for taking him to commissary, filling out the commissary paperwork, reading him posted announcements (something that has been very important since COVID-19), reading him his mail and writing his letters, and taking him to get his medications. Since COVID-19, Mr. Wright has struggled even more to complete his daily tasks. Despite his requests, he has not been given a new companion in his own unit, and his prior companion is not allowed to come to his unit for safety reasons under COVID-19 protocols. Mr. Wright has asked for assistance and a new companion, and has been denied these requests. *See* Ex. M.

To simply categorize Mr. Wright's disabilities as "essentially the same problems" as those he had prior to being arrested is not true. The government relies heavily on this inaccurate proposition by claiming that "despite already being legally and functionally blind," Mr. Wright was able to attempt this offense in the

first place. In other words, he was dangerous then and is dangerous now because he has "essentially the same problems." The assessment of how dangerous or not dangerous Mr. Wright is must include his actual capabilities to commit any future offense. He cannot collect his own food tray or navigate to the restroom. He is completely blind now and was not at the time of the offense. In short, he does not have "essentially the same problems" as he did at the time of his offense conduct. His health is far worse and this makes him less dangerous than he was at the time of the offense.

Most importantly though, is not whether or not Mr. Wright is physically able to be dangerous. It is whether he will be. This analysis of dangerousness and protecting the public contemplates so much more than the offense conduct itself, which is the only real factor the government analyzes. Other factors that can help determine if someone might recidivate (and if the public needs protecting from them) include the kind of community support a person has, recidivism statistics known about certain offenses, their remorse and desire for treatment (or vice versa), and their ability to reoffend.

As Mr. Wright outlined in his motion to this court, all of these considerations weigh in favor of a finding that the public can be adequately protected through his request of home confinement and strict supervised release conditions. First, Mr. Wright has incredible support not just from his family who will be there by his side when he is released, but also from others, unrelated to him, who he has maintained relationships with since being in custody. The government's allegation that "Wright also apparently hid a dark, significant part of his life from everyone," again only accounts for what occurred prior to Mr. Wright's offense. Indeed, the letters of support for compassionate release from others suggest that Mr. Wright has been open with others about his conviction and his struggles and has maintained healthy relationships with supportive individuals so he will have a strong support system once he is released. He has multiple people who are not related and have no personal

1 stake in his release requesting this court consider his compassionate release motion.

2 Another factor to consider when contemplating protecting the public, is the likelihood of recidivism. One way to evaluate that is through statistics, such as the ones discussed by Mr. Murphy and the Court at sentencing and discussed in a DOJ Research Brief. *See* Ex. W. The recidivism rate for a "normal" individual in Mr. Wright's circumstances is only 11.1%, as discussed by Mr. Murphy at sentencing. *See* Dkt. No. 59 at 29. Of course, the likelihood of Mr. Wright's recidivism is diminished from this number because of his physical disabilities and other ways in which he is not the normal kind of offender.

Additionally, Mr. Wright was evaluated by an expert who worked for the BOP for years who also opined that Mr. Wright was unlikely to reoffend. Mr. Murphy, at sentencing, explained to the Court that he hired this expert not to create a report for the Court, but to assist the client in his wishes to understand his disease better and how he could manage it once he was released. Dkt. No. 59 at 14-18. What happened though was this expert who had worked for the BOP for many years – including the MCC in San Diego – opined that Mr. Wright would "likely follow whatever conditions of supervision are placed upon him" and that he "appeared motivated to learn to understand and to control any behavior(s) that would cause harm to others." *See* Ex. V at 4-5. The expert did not sugarcoat the situation, stating in the same breath that "Mr. Wright attempted to commit a heinous crime." Importantly, the expert appropriately parsed out Mr. Wright's likelihood of reoffending with his personal feelings about Mr. Wright's offense conduct. Something the government has failed to do, and is now asking the Court to follow suit.

The Court should also consider Mr. Wright's continuance plea for help, early of acceptance of responsibility, and continued desire for treatment in determining whether his promises to remain law abiding are sincere. From the beginning of this case, Mr. Wright has accepted responsibility and sought help. Even before being

arrested in this case, Mr. Wright had sought help from members of his clergy and been denied help. Mr. Wright is not "hid[ing] a dark, significant part of his life" anymore. He is here, asking from help from everyone – family, the Court, others in his community.

This all cuts against the argument that revising Mr. Wright's sentence to one that is a sentence of home confinement cannot protect the public.

### B. The government does not engage with the remaining § 3553(a) factors.

The government fails to meaningful engage in the remainder of the § 3553(a) factors. While Mr. Wright does not intend to rewrite his entire motion here, there are a few point worth of mentioning. First, the government cherry picks portions of the sentencing transcript highlighting this Court's concerns about Mr. Wright, but leaves out all of the positive characteristics the Court also weighed. For example, the government points out that the Court thought about punishment, stating that Mr. Wright's offense was "'horrific,' 'most deserving of punishment for punishment's sake alone,' and 'most deserving of imposing a sentence that will protect society.'" Gov. Br. at 7; Dkt. No. 59 at 34.

Only seconds later though, the Court found the following:

> The history and characteristics attributed to you, outside of this area, are overwhelmingly positive. I read with great interest the letter from your mother and your doctor, family doctor, Evans, and I appreciate their both being here. You enjoy a great deal of family support, and you are very fortunate and blessed to have that. I accept the representations that you have a deep and abiding faith, you find great solace in the church and I accept the representation that you were attending church and interested in the priesthood for all of the right reasons.

Dkt. No. 59 at 35. These and other positive characteristics are highlighted in detail in Mr. Wright's motion for compassionate release.

The government also fails to meaningfully engage with Mr. Wright's medical issues – to the point where it is even unclear if the government is arguing that Mr. Wright has not met extraordinary and compelling circumstances. Not only

is Mr. Wright blind, but he also has a plethora of other medical issues that the government completely ignores. Mr. Wright is not an individual who can get around from place to place without assistance and he is not going to be someone who could up and flee on supervision without any trace. He is going to for the rest of his life need continuous medical attention, Medicare, social security and disability – all that will require him to lead a law-abiding life and for the federal government to know where he is. His medical conditions are certainly a consideration under § 3553(a) factors because of the suffering he has endured and overcome, but they are also practical considerations when determining other factors such as protection of the public.

The government's concern that a reduced sentence would not meet the punishment factor also ignores Mr. Wright's arguments. Obviously, when this Court made its original decision, there was not an ongoing pandemic that made Mr. Wright at risk of dying or becoming severely ill. Even more importantly, Mr. Wright could still see out of one of his eyes at sentencing. Today, the Court's decision about adequate punishment must be weighed against the backdrop of the COVID-19 pandemic and the loss of Mr. Wright's sight – a collateral consequence of custody that the Court surely did not intend. The BOP has already proven that it cannot adequately care for Mr. Wright. It's mistreatment of his glaucoma caused him to lose eyesight in both of his eyes. If Mr. Wright were to contract COVID-19 and suffer severe medical complications from it, potentially even death, certainly that kind of collateral consequence would be devastating.

### III.   CONCLUSION

For these reasons, and the reasons outlined in the motion for a reduction in his sentence, Mr. Wright requests this Court grant his motion for compassionate release.

Respectfully submitted,

Dated: October 9, 2020

*s/ Chandra L. Peterson*
Federal Defenders of San Diego, Inc.
Attorneys for JOEL WRIGHT

Email: Chandra_Peterson@fd.org